CAMPBELL & WILLIAMS
PHILIP R. ERWIN, ESQ. (11563)
pre@cwlawlv.com
700 South Seventh Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

WILLKIE FARR & GALLAGHER LLP
Craig C. Martin (*pro hac vice*)
cmartin@willkie.com
Matt D. Basil (*pro hac vice*)
mbasil@willkie.com
Sara Tonnies Horton (*pro hac vice*)
shorton@willkie.com
300 North LaSalle
Chicago, IL 60654
Telephone: (312) 728-9000

*Attorneys for Defendants*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| TONKAWA TRIBE OF INDIANS OF OKLAHOMA d/b/a TONKAWA ENTERPRISES; COW CREEK BAND OF UMPQUA TRIBE OF INDIANS; and UMPQUA INDIAN DEVELOPMENT CORPORATION, on behalf of themselves and others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>SCIENTIFIC GAMES CORPORATION, a Nevada corporation; BALLY TECHNOLOGIES, INC., a Nevada corporation; and BALLY GAMING, INC., a Nevada corporation,<br><br>      Defendants. | Case No. 2:20-cv-01637-JCM-BNW<br><br>**DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT OR, IN THE ALTERNATIVE, COMPEL <u>ARBITRATION OR TRANSFER</u>** |

Plaintiffs Scientific Games Corporation, Bally Technologies, Inc. and Bally Gaming, Inc. (collectively, "Defendants"), by and through their undersigned counsel, hereby submit the following Motion to Dismiss Plaintiffs' Second Amended Complaint or, in the Alternative, Compel Arbitration or Transfer. This Motion is made and based upon the following memorandum of points and authorities, all exhibits attached hereto, all pleadings and papers on file herein, and any oral argument the Court shall allow at the time of hearing.

## I.      PRELIMINARY STATEMENT

Defendants manufacture automatic card shufflers, which they sell and lease to casinos. Owing to the superior design of their patented inventions, they have enjoyed strong demand for their products. However, in this late-filed putative class action brought by two of Defendants' customers, Plaintiffs claim that Defendants obtained two patents in 2003 and 2009 by lying to the U.S. Patent and Trademark Office (the "PTO") and sought to enforce those patents in sham litigations filed between 2003 and 2012. Defendants move to dismiss Plaintiffs' antitrust action because it is untimely under the four-year limitations period that applies to Sherman Act claims, or alternatively, to compel Plaintiffs to arbitrate their claims as both Plaintiffs' agreements with the Defendants contain mandatory arbitration provisions that cover the asserted claims.

First, Plaintiffs' claims are plainly time barred and should be dismissed. Not only do the actions giving rise to Plaintiffs' claims date back to 2003 to 2012, but they have also been the subject of other widely-publicized antitrust litigation as early as 2015. In April 2015, an ostensible competitor named Shuffle Tech sued Defendants raising claims that Plaintiffs argue are "closely related" to their own. Second Amended Complaint ¶ 1. The case was tried to verdict in August 2018, the parties subsequently settled, and the verdict was vacated in December 2018. In March 2019, other competitors, TCS John Huxley and Taiwan Fulgent, brought a similar suit—less than two months before the four-year anniversary of the filing of the *Shuffle Tech* complaint—arguing that they did not discover their alleged injuries until they were told by their litigation counsel of the facts giving rise to their antitrust injury in a March 2019 meeting.

In this case, Plaintiffs plead ignorance for even longer.  They assert that they did not know, and could not have known, of the facts they allege until ***June and September of this year***. According to Plaintiffs, at no time in the nine years between 2003 and 2012, when the underlying conduct allegedly occurred, could they have known these facts.  Not when they were paying allegedly supracompetitive prices in 2009 and onward.  Not even when Shuffle Tech publicly filed its complaint in federal court in early 2015 advancing allegations that Plaintiffs say are "closely related" to their own.  Not until more than midway through this year, nearly two decades after the first patent issued, when their antitrust counsel first thought to mention the seventeen years of litigation to them.

Plaintiffs' allegations strain credibility to the point of implausibility, and their case must be dismissed.  Sherman Act claims are subject to a four-year limitations period.  Under the law in this Circuit, *Walker Process* (fraud on the PTO) antitrust claims accrue when the patent is issued, and sham litigation claims accrue when the sham lawsuit is filed.  The Complaint alleges that the last supposedly sham lawsuit was filed in 2012 and the last disputed patent was issued before then. Second Amended Complaint ¶ 27.  This means that Plaintiffs' claims are at least ***four years stale*** and should be dismissed as time-barred.

In the alternative, Defendants request this Court compel Plaintiffs to arbitrate their claims. In the Tonkawa Tribe's Master Agreement with Defendant Bally Gaming, Inc. (now named SG Gaming, Inc.), through which it leases the Defendants' automatic card shufflers, Plaintiff Tonkawa Tribe agreed to submit "any and all controversies, disputes, or claims of any nature arising directly or indirectly out of or in connection with this Agreement" to arbitration.  Similarly, in its License and Lease Agreement with Defendant Bally Gaming, Inc., Plaintiff Umpqua Indian Development Corporation (a corporation of Plaintiff Cow Creek Band of Umpqua Tribe of Indians) agreed to arbitrate "any and all controversies, disputes, or claims of any nature arising directly or indirectly out of or in connection with this Agreement."  The Plaintiffs' claims are based on their lease of

automatic shufflers pursuant to those agreements.   Accordingly, Defendants move to compel Plaintiffs to arbitrate their claims.

Finally, if this Court declines to dismiss Plaintiffs' complaint or compel them to arbitration, the case should be transferred to the Northern District of Illinois, as plaintiffs who filed competing putative class actions in that district have requested.   Another competitor's case and two putative class actions are now pending there and witnesses are located in Illinois.   ECF No. 5, *2.   If this case is not dismissed outright, as it should be, or compelled to arbitration, Defendants join in the competing plaintiffs' request that it be transferred to the Northern District of Illinois, where those related actions are pending.

## II.   STATEMENT OF FACTS

**A.   Defendants Manufacture And Sell Automatic Card Shufflers That Incorporate Their Patent Technology; Plaintiffs Are Customers.**

Defendants sell and lease games, gaming products, and gaming services to casinos and other game and lottery customers.   Using the brand "Shuffle Master" or "SHFL," they are the market leader in the manufacture of automatic card shufflers used in casinos worldwide.   Since innovating and producing the first marketable automatic shufflers in the early 1990s, Defendants have been leaders in innovation and technological development, and hold a robust intellectual property portfolio with over 2,500 worldwide patents, trademarks, and copyrights granted and pending.

Plaintiffs are customers who own and operate casinos, plus a third related entity.   The Tonkawa Tribe of Oklahoma owns and operates two casinos in Oklahoma; the Cow Creek Band of Umpqua Tribe owns and operates a casino in Oregon; and the Umpqua Indian Development Corporation "is a Section 17 corporation of the Plaintiff Cow Creek Band of Umpqua Tribe of Indians." (ECF No. 19, Second Amended Complaint ¶¶ 5–7.)   Plaintiffs allege that they have

4

purchased automatic shufflers for over a decade.[1]  (ECF No. 19, *2 ("The Three Casinos Choosing Nevada Have Substantial and Continuing Alleged Damages for Over a Decade").)

**B.   Between 2003 And 2012, Defendants Or Their Predecessors Filed Several Cases To Successfully Protect Their Intellectual Property.**

Plaintiffs make various allegations regarding certain of the Defendants' patents.  They allege that Defendants obtained two patents by fraud: the '982 patent and the '935 patent.  Second Amended Complaint ¶ 18.  The Complaint alleges that the '982 patent was issued in November 2003 based on an application filed in 2002 (¶ 18), that the '935 patent was issued in April 2009 based on an application filed in 2003 (¶ 45), and that reexamination proceedings for both ended in summer 2015 (¶ 24).  In other words, any supposed fraud on the PTO occurred between five and eighteen years ago.

The Complaint also discusses several lawsuits that Defendants and their predecessors filed between 2003 and 2012 to assert their patent rights:

- A counterclaim filed on August 25, 2003, after CARD (a casino products supplier who sought to sell a competing shuffler) filed a declaratory judgment action on May 6, 2003.  Second Amended Complaint ¶ 25.  The lawsuit resulted in a settlement.  *Id*. ¶ 26.
- A suit filed on October 5, 2004 against non-party VendingData (a shuffler manufacturer) resulting in a grant of summary judgment in VendingData's favor.  *Id*. ¶ 50.
- A suit filed on November 11, 2009 against non-party Taiwan Fulgent (another shuffler manufacturer) resulting in Taiwan Fulgent agreeing not to enter the U.S. market for three years.  *Id*. ¶ 50.
- A suit filed on September 14, 2012 against TCS John Huxley (a casino product distributor who was in business with Taiwan Fulgent) resulting in TCS's agreement not to show the A Plus shuffler at an upcoming trade show

---

[1] The Second Amended Complaint alleges purchases since at least September 2016. (¶¶ 5-7.)  This date appears a holdover from the Complaint and First Amended Complaint, which both alleged a damages period that was limited to September 2016 to present (*i.e.*, four years prior to suit).  Complaint ¶ 54; First Amended Complaint ¶ 58.  The Second Amended Complaint alleges a damages period from April 2009 to present.  Second Amended Complaint ¶ 64.  However, to the extent the Court concludes that this portion of the pleading is ambiguous and more specific information is needed regarding when Plaintiffs purchased or leased shufflers, Defendants move for a more definitive statement pursuant to Rule 12(e).  *See* Fed. R. Civ. Proc. 12(e).

and not to represent it was selling the A Plus shuffler in the U.S. market. *Id*. ¶ 50.

- A suit filed on October 12, 2012 against DigiDeal (a shuffler manufacturer) in this Court. *Id*. ¶ 27.

As this list makes clear, the most recent allegedly sham suit was filed over eight years ago, in October 2012.[2]

**C.    In 2015, A Competitor Named Shuffle Tech Filed A Highly-Publicized Antitrust Suit Against Defendants.**

Not only did the underlying conduct occur outside of the limitations period, but it has also been the subject of at least two prior and highly-publicized antitrust cases raising what Plaintiffs argue are "closely related" allegations.  Second Amended Complaint, ¶ 1.  In 2015, DigiDeal's business partner Shuffle Tech (who had not been party to the 2012 DigiDeal case) filed an antitrust lawsuit alleging that Defendants obtained their patents by committing fraud on the PTO and that they enforced the patents through sham litigation, the same patent suits on which Plaintiffs rely. Second Amended Complaint ¶ 25; *Shuffle Tech, et al. v. Scientific Games Corp.*, No. 15-cv-3702 (N.D. Ill.) ("*Shuffle Tech*"); *compare* Second Amended Complaint ¶ 50 *with* Complaint, *Shuffle Tech Int'l. LLC v. Scientific Games Corp.*, No. 1:15-cv-03702, ECF No. 1 ¶ 58 (N.D. Ill. Apr. 28, 2015).   The case, which was regularly reported on by media publications and disclosed in Defendants' securities filings, Ex. A, was tried to verdict and settled before appeal.  *See Shuffle Tech Int'l, LLC, et al. v. Scientific Games Corp., et al.*, No. 1:15-cv-3702, ECF No. 335 (N.D. Ill. Dec. 24, 2018) ("The judgment based on the jury verdict in this case . . . and the minute order entering the jury verdict . . . are hereby vacated and stricken and shall have no further force and effect.").  Another competitor, distributor TCS John Huxley, which had previously been sued by Defendants, filed a substantially similar case in Illinois in 2019; that case remains pending.  *See*

---

[2] Plaintiffs also cite SHFL's 2018 filing of a proposed Proof of Claim in DigiDeal's bankruptcy. Second Amended Complaint ¶ 32.  But, as discussed below, this has no bearing on the statute of limitations calculation.  *See infra*, note 5.

*TCS John Huxley America, Inc., et al. v. Scientific Games Corp.*, No. 19 C 1846, 2020 WL 1678258 (N.D. Ill. Mar. 20, 2020).

**D.    Various National Media Extensively Covered The Prior Claims And Underlying Allegations.**

At least as far back as 2002, various national media were reporting that a competitor had accused Defendants of lying to the PTO.[3]   Dow Jones Newswire's coverage noted that VendingData "asserts counterclaims against Shuffle Master for breach of contract, violation of the Uniform Trade Secrets Act, conversion, ***breach of duty of candor to the U.S. Patent and Trademark Office and fraud***."   *VendingData Denies It Infringed On Shuffle Master Patent*, Dow Jones Newswires, May 7, 2002 (emphasis added).  Ex. B.  In 2005, Bloomberg Law reported that VendingData "intends to pursue its remedies against Shuffle Master, Inc. ***arising from its wrongful use of the judicial system to impede competition*** in the market for automatic card shuffler and dealing machines."   *Federal Circuit Court of Appeals Grants VendingData Corporation's Appeal and Vacates Preliminary Injunction Order*, Bloomberg Law, Dec. 28, 2005 (emphasis added).  Ex. C.

Both Law360 and Bloomberg Law extensively covered the *Shuffle Tech* litigation throughout 2015.  *See, e.g.*, *Card Shuffler Co. Deals $100M Monopoly Suit To Rival*, Law360, April 28, 2015 (Shuffle Tech alleges Scientific Games "illegally monopolized the market for shuffling machines used in casinos by filing sham patent lawsuits against rival manufacturers" asserting "a family of fraudulently obtained patents"); *Scientific Games Says Standing Sinks $100M Antitrust Suit*, Law360, June 29, 2015 ("Shuffle Tech also cited four [of Defendants'] suits similar to the DigiDeal case in its complaint, dating to the early 2000s."); *Plaintiffs Defend $100M*

---

[3] This Court may take judicial notice of news articles in ruling on a motion to dismiss.  *See* F.R.E. 201; *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2010) (taking judicial notice of newspapers to affirm dismissal of complaint on grounds that plaintiff was on constructive notice of her claims).  *See also Benak ex rel. All. Premier Growth Fund v. All. Capital Mgmt. L.P.*, 435 F.3d 396, 401 (3d Cir. 2006) (affirming dismissal of complaint based on judicial notice of newspaper articles that put plaintiff on inquiry notice of securities fraud).

7

*Card Shuffler Antitrust Suit*, Law360, July 20, 2015; *Bally Faces Monopoly Suit On Casino Card Shufflers*, Bloomberg Law, Oct. 13, 2015 (court "held that Shuffle Tech stated a so-called *Walker-Process* [*sic*] claim for monopolization under the Sherman Act for sham patent litigation."). Exs. D, E, F, G.

**E.   Plaintiffs Allege Their Case Pleads Allegations "Closely Related" To Those In *Shuffle Tech*—But More Than Four Years Later.**

On September 3, 2020, Plaintiffs filed their "direct purchaser" putative class action against Defendants. They allege in the first paragraph of their Complaint that "[t]his matter is closely related to an action brought against Defendants by their competitors," the 2015 *Shuffle Tech* case. Second Amended Complaint, ¶ 1. Two other customer plaintiffs who filed a similar action in the Northern District of Illinois based on what they claim are the same allegations have moved to have this case transferred there, and likewise argue that this case is "closely related" to *Shuffle Tech*, *TCS*, and their own putative class action. ECF No. 5, *2; see also *Giuliano v. Scientific Games Corp.*, Case No. 1:20-cv-05262 (N.D. Ill.).

**F.   Plaintiffs Agreed To Arbitrate Their Claims.**

Long before this suit began, each of the Plaintiffs agreed to arbitrate their claims against Defendants. Those arbitration agreements clearly cover the claims at issue here.

On November 20, 2013, Plaintiff Tonkawa Tribe entered into a "Master Agreement" with Defendant Bally Gaming, Inc. to lease equipment, including automatic shufflers (the "Master Agreement"). Ex. H.[4] That agreement provided that it "shall govern the purchase and lease/participation of Bally equipment," and applied to subsequent lease agreements. Ex. H at *1.

---

[4] Each agreement contains a clause binding each party to "hold in confidence any information supplied to it by the other and designated in writing as confidential." Ex. H, Term 2; Ex. I, Term 2. Defendants intend to consult with Plaintiffs about the filing of a Protective Order in this case. But until one is entered, out of an abundance of caution to avoid disclosing confidential information, Defendants have redacted the agreements except for the relevant arbitration clauses.

In the Master Agreement, Plaintiff Tonkawa Tribe agreed to arbitrate all claims related to its lease of automatic shufflers.  Specifically, Term 8.2 of the Master Agreement provides:

> 8.2     *Submission of Disputes to Binding Arbitration.*  The parties agree that any and all controversies, disputes or claims of any nature arising directly or indirectly out of or in connection with this Agreement (including *without limitation* claims relating to the validity, performance, breach, and/or termination of this Agreement) shall be submitted to binding arbitration for final resolution.  The arbitration shall follow the Commercial Arbitration Rules of the American Arbitration Association ("AAA") or other mutually agreed-upon procedures and shall be conducted in a mutually agreeable location.

Ex. H at Term 8.2.  The parties further agreed that either could bring an action in federal court to compel arbitration:

> 8.3     *Enforcement/Compelling Arbitration.*  The parties agree that enforcement of any arbitration award, as well as any action to permit or compel arbitration, may be brought in federal or state court.  If either federal or state court decline jurisdiction, then such action may be brought in Tribal Court.  With respect to any action to review or enforce any arbitration award, the parties agree that the standards and provisions of the Federal Arbitration Act shall apply.

*Id*. at Term 8.3.

The other Plaintiffs, the Cow Creek Band of Umpqua Tribe and the Indian Development Corporation, also agreed to arbitrate their claims.  On March 30, 2015, the Umpqua Development Corporation and Bally Gaming, Inc. entered into an agreement for the Umpqua Development Corporation to lease shufflers from Bally (the "Lease Agreement").  Ex. I.  In that Lease Agreement, the parties agreed to arbitrate all disputes related to the lease of the automatic shufflers.  Terms 6.6(a) and 6.6(b) in the Lease Agreement are identical to Terms 8.2 and 8.3 in the Master Agreement between Bally and the Tonkawa Tribe.  *Id*. at Term 6.6.

## III.     ARGUMENT

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  In analyzing a complaint, courts accept factual

allegations but disregard legal conclusions.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id*.  "A statute-of-limitations defense, if apparent from the face of the complaint, may properly be raised in a motion to dismiss." *Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (internal quotations omitted).  That is the case here.

## A.   Plaintiffs' Claims Are Barred By The Sherman Act's Four-Year Statute of Limitations.

Under the Sherman Act, antitrust actions are barred "unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15b.  It is clear from the face of this Complaint that Plaintiffs' claims accrued more than four years before the Complaint was filed.  Therefore, the case should be dismissed.

### 1.   Plaintiffs' claims accrued more than four years before suit.

An antitrust cause of action accrues when a defendant commits the act that causes the alleged injury.  *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 238 (9th Cir. 1987) ("The initiation of a lawsuit is the final, immutable act of enforcement.").  For claims that the defendant procured its patent by fraud (*Walker Process* claims), that period begins to run when the patent is issued.  *Westlake Servs., LLC v. Credit Acceptance Corp.*, No. CV1507490SJOMRWX, 2017 WL 8948263, at *3 (C.D. Cal. Dec. 28, 2017) ("For antitrust actions allegedly involving patent fraud, the four-year statute of limitations generally begins running when the allegedly fraudulently procured patent [is] issued").  For claims alleging the defendant filed anticompetitive litigation to clear the market of competitors (sham litigation claims), the period begins to run when the alleged sham complaint was filed or served.  *Pace Indus., Inc.*, 813 F.2d at 238; *see also Al George, Inc. v. Envirotech Corp.*, 939 F.2d 1271, 1275 (5th Cir. 1991); Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 320.

Here, Plaintiffs allege that the relevant patents were issued on or before October 2012. Second Amended Complaint ¶¶ 18, 45.  Therefore, Plaintiffs' *Walker Process* claim accrued no

10

later than October 2012 and the four-year statutory period expired no later than October 2016.  *See, e.g.*, *Westlake Servs., LLC*, 2017 WL 8948263 at *3.  By the time Plaintiffs filed their complaint in September 2020, their claims were more than four years late.

Plaintiffs also assert injury based on alleged sham lawsuits that Defendants filed from 2003 to 2012.  Second Amended Complaint ¶ 50.  Courts in the Ninth Circuit have held that the limitations period runs from the date the sham lawsuit is ***filed*** or ***served***, and that the prosecution of the already-commenced litigation does not extend the antitrust plaintiff's time to sue.  *See Pace Indus., Inc.*, 813 F.2d at 237 ("last overt act was allegedly anticompetitive filing of state court action on restrictive covenant, not subsequent prosecution of suit"); *Westlake Servs., LLC*, 2017 WL 8948263 at *5 ("[t]he initiation of a lawsuit is the final, immutable act of enforcement of an allegedly illegal contract that constitutes an overt act for the purposes of the continuing violation doctrine").  Thus, the last date on which Plaintiffs' sham litigation claim could have accrued was October 2012, when the last allegedly sham litigation was filed,[5] meaning that the limitations period likewise expired in October 2016.  Again, Plaintiffs are at least four years late.

---

[5] Plaintiffs cite SHFL's 2018 filing of a proposed Proof of Claim in DigiDeal's bankruptcy. Second Amended Complaint ¶ 32.  But that was not a new claim.  The proposed Proof of Claim requested only the right to pursue litigation that SHFL had filed against the debtor (DigiDeal) ***in 2012*** and collect any judgment.  *In re Digideal Corp.*, No. 17-00449-FPC1, ECF No. 423 at *1. ECF No. 424 at *17 (Bankr. E.D. Wash. Jun 13, 2018).  For statute of limitations purposes, it is well established that the filing of a proof of claim is not the equivalent of the commencement of a civil case.  *Easley v. Pettibone Michigan Corp.*, 990 F.2d 905, 912 (6th Cir. 1993) (rejecting argument that filing a bankruptcy claim constituted commencement of an action and thus tolled the statute of limitations, noting "[t]here are significant differences between a bankruptcy claim and a civil complaint"); *Linders v. MN Airlines, LLC*, 2006 WL 167611 at *2 (E.D. Mo.) (a bankruptcy claim is not an action that tolls the limitations period); *Grimmett v. Brown*, 75 F.3d 506, 513–14 (9th Cir. 1996) (false bankruptcy filing is not an independent act for statute of limitations in a RICO claim); *cf. Midland Funding, LLC v. Johnson*, 137 S. Ct. 1407, 1413 (2017) (filing a bankruptcy claim that is facially barred by the statute of limitations is not an FDCPA violation because "the context of a civil suit differs significantly from . . . [a] bankruptcy proceeding").

In any event, the motion that Plaintiffs cite was not even a proof of claim—it was a motion seeking leave to extend the bar date to file a late proof of claim.  *Id.* ECF No. 423 at *7.  In an ironic twist,

**2.     Neither the discovery rule, fraudulent concealment, nor the continuing violation doctrine can save Plaintiffs' claims.**

Implicitly acknowledging that *something* is required to resuscitate their long-dead claims, Plaintiffs attempt to invoke the discovery rule, which provides that a claim does not accrue until "the plaintiff knows or has reason to know of the injury which is the basis of the action." *Trotter v. Int'l Longshoremen's & Warehousemen's Union, Local 13*, 704 F.2d 1141, 1143 (9th Cir. 1983); *see* Second Amended Complaint ¶¶ 58–62.   But the Ninth Circuit does not apply the discovery rule to antitrust claims.  *See In re Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1208–11 (N.D. Cal. 2015) (collecting cases from this Circuit and others).   In this Circuit, courts apply the injury rule instead, holding that an antitrust cause of action accrues when the plaintiff is injured. *Id.*  The Ninth Circuit has been clear: "We do not require a plaintiff to actually discover its antitrust claims before the statute of limitations begins to run."  *Hexcel Corp. v. Ineos Polymers, Inc.*, 681 F.3d 1055, 1060 (9th Cir. 2012).

Plaintiffs fare no better under a fraudulent concealment theory.   Under that doctrine, "a statute of limitations may be tolled if the defendant fraudulently concealed the existence of a cause of action in such a way that the plaintiff, acting as a reasonable person, did not know of its existence."  *Hexcel Corp*, 681 F.3d at 1060.   Plaintiff bears "the burden of pleading and proving fraudulent concealment." *Id.* (quoting *Conmar Corp. v. Mitsui & Co. (U.S.A.), Inc.*, 858 F.2d 499, 502 (9th Cir. 1988)).   A plaintiff must plead, with particularity, specific facts showing both that the defendant "affirmatively misled it" and that the plaintiff "had *neither actual nor constructive knowledge* of the facts giving rise to its claim *despite its diligence* in trying to uncover those facts." *Id.* (internal quotations omitted) (emphases added); *see also* Fed. R. Civ. P. 9(b); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 885–86 (N.D. Cal. 2015).   Plaintiffs have not met that burden.

---

DigiDeal and Shuffle Tech both opposed, arguing that SHFL's proposed proof of claim was untimely.  *Id.* ECF No. 430 at *1, ECF No. 433 at *2.

First, Plaintiffs have not pled an affirmative act of concealment.  They refer generally to "Defendants' fraudulent patent concealment before the United States PTO" and "the concealed, sham nature of their litigations[.]"  Second Amended Complaint ¶ 58.  But that is not enough.  The Ninth Circuit has rejected the suggestion that an underlying violation is "self-concealing," and instead requires proof that the plaintiff's lack of notice "was the result of affirmative conduct by the defendant."  *Conmar Corp.*, 858 F.2d at 505. Plaintiffs have not pled any such affirmative conduct by the Defendants.

Second, Plaintiffs cannot plausibly allege that they did not know, and should not have known, of their injury until now.  A plaintiff cannot avail itself of a tolling theory unless it was diligent in investigating its claims.  *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–95 (1997) (citing Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 338 (rev. ed. 1995)).  If "the plaintiff should have been alerted to facts that, following duly diligent inquiry, could have advised it of its claim," then fraudulent concealment does not apply.  *Hexcel Corp.*, 681 F.3d at 1060.

These allegations have been public for far too long, and in too many prior cases, for Plaintiffs to plausibly allege that they could not have discovered their claims until now.  In fact, in Plaintiffs' own telling, their case is "closely related" to one publicly filed in federal court ***more than five years ago***.  Second Amended Complaint ¶ 1; see also ECF No. 19, *2.  They also argue that their case is "related to" SHFL's 2012 case against DigiDeal, which was litigated for nearly four years before the court granted summary judgment on a "similar claim" involving "the same event, alleged sham litigation," "similar questions of fact," and "the same patents."  ECF No. 19, *3.

Allegations that Defendants committed fraud on the PTO or are monopolists have been raised in prior cases (including the 2015 *Shuffle Tech* litigation) and reported in the press for years.[6] *See, e.g.*, *VendingData Denies It Infringed On Shuffle Master Patent*, Dow Jones Newswires, May

---

[6] This Court may take judicial notice of these news articles.  See *supra* note 4.

7, 2002; *Federal Circuit Court of Appeals Grants VendingData Corporation's Appeal and Vacates Preliminary Injunction Order*, Bloomberg Law, Dec. 28, 2005; *Card Shuffler Co. Deals $100M Monopoly Suit To Rival*, Law360, April 28, 2015; *Scientific Games Says Standing Sinks $100M Antitrust Suit*, Law360, June 29, 2015; *Plaintiffs Defend $100M Card Shuffler Antitrust Suit*, Law360, July 20, 2015; *Bally Faces Monopoly Suit On Casino Card Shufflers*, Bloomberg Law, Oct. 13, 2015. Exs. B, C, D, E, F, G.  These tired claims are as baseless today as they were then.

Any attempt to invoke the continuing violation doctrine would likewise fail, as the theory has been squarely rejected in this context.  Under the continuing violation doctrine, a new overt act by the defendant may restart the four-year clock only if the new act meets two criteria: "1) It must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Pace Indus., Inc.*, 813 F.2d at 238.

It is well established that continued sales at an allegedly supracompetitive price do not trigger the accrual of new causes of action.  The limitations period "is not extended by continued sales at an allegedly monopolistic price because the 'monopolist's simple charging of its profit-maximizing price is a naturally expected consequence of a monopoly and can hardly be said to be [an] independent [act].'" [7] *Kaiser Found. v. Abbott Labs.*, No. CV02-2443-JFWFMOX, 2009 WL 3877513, at *7 (C.D. Cal. Oct. 8, 2009) (quoting II Areeda & Hovenkamp, Antitrust Law, ¶ 320c4, at 298-99 (3d ed. 2007)); *Oliver v. 3D-3C*, LLC, No. C 11-01260 JSW, 2012 WL 1835740, at *3

---

[7] The rule is different for price fixing cases.  In a price fixing conspiracy, each time a co-conspirator charges the agreed-upon price, it engages in a new and independent act that inflicts new and accumulating injury on the plaintiff.  *See Pace Indus.,* 813 F.2d at 238.  Each time it sells at the fixed price, it in essence agrees again to continue conspiring with its rivals.  *See In re California Bail Bond Antitrust Litig.*, No. 19-CV-00717-JST, 2020 WL 3041316, at *19 (N.D. Cal. Apr. 13, 2020) (emphasis added) ("each time a defendant sells its *price-fixed* product, the sale constitutes a new overt act causing injury to the purchaser and the statute of limitations runs from the date of the act").  In contrast, for a *Walker Process* or sham litigation claim, the illegal act is obtaining the patent by fraud or filing baseless lawsuits to crowd out rivals.  *Pace Indus.*, 813 F.2d at 237; *Westlake Servs.*, LLC, 2017 WL 8948263, at *3.  Thereafter, continuing to sell at allegedly supracompetitive prices is the naturally expected consequence of the defendant's earlier actions and thus is not a continuing violation.  *See* Areeda & Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles and Their Application, ¶ 320 (3d ed. 2007).

14

(N.D. Cal. May 21, 2012), *rev'd and remanded on other grounds, Oliver v. SD-3C LLC*, 751 F.3d 1081 (9th Cir. 2014) ("[t]he statute of limitation runs from the time of commission of the act, notwithstanding that high prices may last indefinitely into the future"); *see also Midwestern Mach. Co. v. Nw. Airlines, Inc.*, 392 F.3d 265, 269–70 (8th Cir. 2004); *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014).

### 3. Plaintiffs' attempt to plead estoppel cannot save their claims either.

Plaintiffs make one more attempt to save their claims by pleading that the 2018 "*Shuffle Tech* judgment establishes in part that Defendants had monopolized the relevant market," possessed monopoly power, and harmed consumers. Second Amended Complaint ¶ 63. This fails for two reasons.

First, there is simply no support for the proposition that a judgment in ***another plaintiff's*** case does anything to restart the limitations period. In fact, there is ample support for the opposite conclusion: the existence of prior related litigation can confirm that the limitations period already ran. *See, e.g., Molecular Diagnostics Labs. v. Hoffmann-La Roche Inc.*, 402 F. Supp. 2d 276, 284 (D.D.C. 2005) (because the case was similar to a 1999 case, the plaintiffs were on notice of their claims in 1999); *Med. Mut. of Ohio, Inc. v. Braintree Labs.*, No. CIV. 10-604-SLR, 2011 WL 2708818, at *4 (D. Del. July 12, 2011) ("a plethora of information evaluated by the court in connection with the [prior] litigation—for example, the '183 patent and its prosecution history— was publicly available prior to the court's 2008 opinion.").

Plaintiffs' bare allegation that the 2018 judgment in the 2015 *Shuffle Tech* case "establishes ***in part***" Defendants' violation and Plaintiffs' injury does not change anything. Second Amended Complaint ¶ 63 (emphasis added). Plaintiffs' alleged injury occurred, and thus the limitations period began to run, years before the judgment. *See, e.g., Pace Indus*, 813 F.2d at 238; *Al George, Inc.*, 939 F.2d at 1275. Creative pleading and half-truths cannot change reality.

Second, the 2018 *Shuffle Tech* judgment was vacated, as Plaintiffs admit in their Complaint.  Second Amended Complaint ¶ 51.  Thus, even if the 2018 judgment once had an effect on the limitations period (and it did not), it no longer does.

**B.      In The Alternative, Plaintiffs' Claims Must Be Arbitrated.**

If Plaintiffs' claims are not dismissed in their entirety—which, for the reasons noted above, they should be—then the Court should compel Plaintiffs to arbitrate.  The Federal Arbitration Act ("FAA") governs arbitrability.  9 U.S.C. § 1 *et seq*.  The controlling section of that act, section 3, provides:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  Thus, the FAA requires a district court to compel arbitration if the matter at issue is within the scope of an applicable arbitration agreement.  9 U.S.C. §§ 3–4.

The FAA permits a party to a valid arbitration agreement to ask the Court to compel arbitration, so long as the court has jurisdiction over the underlying dispute.  9 U.S.C. § 4; *Vaden v. Discover Bank*, 556 U.S. 49, 50 (2009).  This Court has federal-question subject-matter jurisdiction over Plaintiffs' antitrust claims, as pled in Plaintiffs' Second Amended Complaint.  28 U.S.C. § 1331; Second Amended Complaint ¶ 6.  Therefore, this Court has jurisdiction to compel Plaintiffs to arbitrate.  *See Vaden*, 556 U.S. at 70.

Arbitration must be compelled where (1) a valid, enforceable agreement to arbitrate exists and (2) the claims at issue fall within the scope of that agreement.  *See Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987).  An arbitration agreement governed by the FAA is presumptively valid and enforceable.  *See Mitsubishi Motors Corp. v. Solver Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626-27 (1985).  The Supreme Court has instructed that "any doubts concerning

the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983).

Here, (1) the Court should compel Plaintiffs to arbitrate because they are subject to a binding arbitration agreement that applies to their claims and (2) arbitration cannot be class-wide because Defendants did not (and do not) agree to class arbitration.

**1.    Plaintiffs are bound by their agreement to arbitrate their antitrust claims.**

Here, there plainly is a valid and enforceable agreement to arbitrate. Plaintiffs' agreements included broad arbitration clauses that cover any dispute "arising directly or indirectly out of or in connection with this Agreement." Ex. H Term 8.2; Ex. I Term 6.6(a). That clause clearly covers Plaintiffs' claims, which arise out of their lease of shufflers pursuant to these agreements for allegedly inflated prices. Second Amended Complaint ¶¶ 5–7. Therefore, this Court should compel arbitration and stay this action. *See* 9 U.S.C. § 3; *Sullivan v. Gen. Steel Domestic Sales*, No. 307CV00604LRHRAM, 2008 WL 2414045, at *7 (D. Nev. June 11, 2008) (staying an action and compelling arbitration under arbitration clause).

Nor is there any doubt that the claims at issue in this case should be arbitrated. Courts have squarely held that antitrust claims are arbitrable. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 28 (1991) ("The Sherman Act, the Securities Exchange Act of 1934, RICO, and the Securities Act of 1933 all are designed to advance important public policies, but, as noted above, claims under those statutes are appropriate for arbitration."); *Nghiem v. NEC Elec., Inc.*, 25 F.3d 1437, 1441–42 (9th Cir. 1994); *In re Apple & AT & TM Antitrust Litig.*, 826 F. Supp. 2d 1168, 1175 (N.D. Cal. 2011). The Ninth Circuit has held that where, as here, the arbitration clause extends to "disputes arising in connection" with an agreement, the language is "interpreted liberally." *See, Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720-21 (9th Cir. 1999) ("the language 'arising in connection with' reaches every dispute between the parties having a significant relationship to the contract and all disputes having their origin or genesis in the contract."). Because Plaintiffs' claims arise out of leases with Defendants, and because those claims are

17

arbitrable under the agreements' arbitration clauses and applicable law, this Court must compel Plaintiffs to arbitrate.  9 U.S.C. §§ 3–4.

### 2.      Plaintiffs' claims cannot be arbitrated on a class-wide basis.

The arbitration clauses in the Master Agreement and Lease Agreement do not contain agreements to arbitrate on a class-wide basis.  *See* Ex. H Term 8.2; Ex. I Term 6.6(a).  Accordingly, class-wide arbitration is not permitted.

In *Lamps Plus v. Varela*, the Supreme Court held that class arbitration is unavailable if the contract is silent or ambiguous on the issue.  139 S. Ct. 1407, 1419 (2019).  The arbitration clause at issue in that case did not refer to class proceedings.  *Id.* at 1413.  The Ninth Circuit had held that this "ambiguity" allowed class arbitration.  *Id.*  On appeal, the Supreme Court explicitly rejected that interpretation: "We [ ] face the question whether, consistent with the FAA, an ambiguous agreement can provide the necessary 'contractual basis' for compelling class arbitration. . . . We hold that it cannot."  *Id.* at 1415 (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010)).

The *Lamps Plus* Court explained that there is a "fundamental difference" between class arbitration and traditional individualized, bilateral arbitration.  *Id.* at 1416.  The Court held that under the FAA, the "default rule" is ***against*** class arbitration, and the FAA "requires more" to overcome this default.  *Id.* at 1417, 1419.  That is because "class arbitration sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011).

Whether a party can bring its claim as a class arbitration is a threshold issue of arbitrability that a court must decide.  *Shivkov v. Artex Risk Sols., Inc.*, 974 F.3d 1051, 1065–66 (9th Cir. 2020); s*ee also Reed Elsevier, Inc. v. Crockett*, 734 F.3d 594, 599 (6th Cir. 2013) (holding that a reference to the AAA Commercial Rules of Arbitration does not delegate class arbitrability to the arbitrator); *Chesapeake Appalachia, LLC v. Court Petroleum, LLC*, 809 F.3d 746, 761 (3d Cir. 2016) (same);

*Catamaran Corp. v. Towncrest Pharmacy*, 864 F.3d 966, 973 (8th Cir. 2017) (same).  In ruling on a motion to compel arbitration, a court may therefore direct that the arbitration shall be on an individual basis rather than class-wide.  *Yu v. Volt Info. Scis., Inc.*, 2019 WL 3503111, at *7 (N.D. Cal. Aug. 1, 2019) (compelling individual, non-class arbitration).

Here, the Defendants did not agree to arbitrate on a class-wide basis.  The Lease Agreements do not provide for class arbitration.  *See* Ex. H Term 8.2; Ex. I Term 6.6(a).  Therefore, if the case is not dismissed outright, this Court must compel each Plaintiff to arbitrate its antitrust claims on an individual basis.  *Lamps Plus*, 139 S. Ct. at 1419; 9 U.S.C. §§ 3-4.

## C.  In the Alternative, This Case Should Be Transferred to the Northern District of Illinois.

If the Court declines to dismiss Plaintiff's Complaint, and declines to compel arbitration, then it should transfer the case to the Northern District of Illinois.  As with the discussion of the limitations period, this analysis turns on the fact that this case is (in Plaintiffs' words) "closely related" to cases in the Northern District of Illinois.  Second Amended Complaint ¶ 1.  In fact, two customer plaintiffs who filed competing putative class actions in that district have moved to transfer this case there, advancing the same argument.  ECF No. 5.  Accordingly, if the case is not dismissed in its entirety on limitations grounds, or sent to arbitration, then Defendants support the motion to transfer.  Here, there are two independent and sufficient bases for transfer: 28 U.S.C. § 1404 and the "first-to-file" rule.

First, Section 1404 allows this Court to transfer this case to "any civil district where it might have been brought" if doing so is "in the interests of justice."  28 U.S.C. § 1404.  If the transferee court has personal jurisdiction over the defendants, the decision to transfer is in the discretion of this Court, and "thus calls on the district court to weigh in the balance a number of case-specific factors" in its "individualized, case-by-case determination." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988) (internal quotations omitted).  These factors may include "(1) the location where the relevant agreements were negotiated and executed, (2) the state that is most

familiar with the governing law, (3) the plaintiff's choice of forum, (4) the respective parties' contacts with the forum, (5) the contacts relating to the plaintiff's cause of action in the chosen forum, (6) the differences in the costs of litigation in the two forums, (7) the availability of compulsory process to compel attendance of unwilling non-party witnesses, and (8) the ease of access to sources of proof." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000).

Here, Defendants are subject to personal jurisdiction in the Northern District of Illinois, as they have sold and leased card shufflers within that District, including to members of Plaintiffs' proposed class.  See 15 U.S.C. § 22; *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) ("In a statute providing for nationwide service of process, the inquiry to determine minimum contacts is thus whether the defendant has acted within any district of the United States or sufficiently caused foreseeable consequences in this country.").

The analysis thus turns to the discretionary factors.  The sixth (costs of litigation), seventh (availability of compulsory process), and eighth (ease of access to sources of proof) *Jones* factors weigh in favor of transfer.  As Plaintiffs point out in their Complaint, the "closely related" *Shuffle Tech* case was litigated in the Northern District of Illinois.  Second Amended Complaint ¶ 1.  There are now ***three*** additional closely related cases pending in the Northern District of Illinois that each rely on substantially the same factual allegations, and one of those cases has been pending for more than 18 months.  ECF No. 5.  "It is 'well established that the existence of a related action pending in the transferee court weighs heavily towards transfer.'" *Shull v. Univ. of Queensland*, No. 218CV01781APGBNW, 2019 WL 4392520, at *1 (D. Nev. Sept. 12, 2019) (quoting *JetBlue Airways Corp. v. Helferich Patent Licensing, LLC*, 960 F. Supp. 2d 383, 400-01 (E.D.N.Y. 2013)).  Transferring to the Northern District of Illinois would reduce all parties' litigation costs as it would facilitate streamlined discovery between all plaintiffs and Defendants (if any of the cases proceed to merits discovery).  Transfer would also ease Plaintiffs' access to sources of proof in coordination with the other consumer plaintiffs in that District.

The first (where the agreements were negotiated and executed) and fourth (the parties' contacts with the forum) factors also weigh in favor of transfer.  Plaintiffs are located out of district, in Oklahoma and Oregon.  Second Amended Complaint ¶¶ 5-7.

The remaining *Jones* factors should be given little weight.  The second factor (governing law) carries no weight where, as here, the sole claims are under federal law.  *See, e.g.*, *Earth Island Inst. v. Quinn*, 56 F. Supp. 3d 1110, 1117 (N.D. Cal. 2014) ("since the action involves federal law, neither district is more 'familiar with the governing law.'").  The third (plaintiff's choice of forum) and fifth (contacts relating to cause of action in the forum) are of little relevance in a putative nationwide class action where the plaintiffs do not reside in the forum.  *See, e.g.*, *In re Galectin Therapeutics, Inc. Sec. Litig.*, 2015 WL 260881, at *4 (D. Nev. Jan. 21, 2015) ("when an individual brings a derivative suit or represents a class, the named plaintiff's choice of forum is given less weight."); *Perez v. Performance Food Grp., Inc.*, 2017 WL 66874, at *3 (N.D. Cal. Jan. 6, 2017) ("Plaintiff's choice of forum is entitled little deference because he has brought a class action, does not reside in the Northern District . . . and did not suffer any of the alleged violations here."); *Park v. Dole Fresh Vegetables, Inc.*, 964 F. Supp. 2d 1088, 1094 (N.D. Cal. 2013) (case transferred because plaintiffs did not reside in the forum and sued on behalf of a putative class).

Critically, Plaintiffs' admission that they are engaging in forum shopping in a mistaken belief that Ninth Circuit law will be more favorable for their estoppel theory (ECF No. 31, *6–9) renders their forum choice irrelevant and strongly favors transfer.  *See, e.g.*, *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001) ("If there is any indication that [a] plaintiff's choice of forum is the result of forum shopping, [the] plaintiff's choice will be accorded little deference."); *Cadenasso v. Metro. Life Ins. Co.*, 2014 WL 1510853, at *5 (N.D. Cal. Apr. 15, 2014) (transferring case because of plaintiff's forum shopping).

Second, the "first-to-file" rule is an independent and sufficient basis to transfer.  It can be applied when there are two "cases involving the same parties and issues have been filed in two different districts." *Cedars-Sinai Med. Ctr. v. Shalala*, 125 F.3d 765, 769 (9th Cir. 1997).  "The

second district court has discretion to transfer, stay, or dismiss the second case in the interest of efficiency and judicial economy." *Id*. The decision to apply the rule is within the district court's discretion, but there are three relevant factors: "chronology of the lawsuits, similarity of the parties, and similarity of the issues." *Kohn Law Grp., Inc. v. Auto Parts Mfg. Mississippi, Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015).

In this case, all three factors favor transfer. The ongoing *TCS* litigation was filed in 2018, and the plaintiffs in that case claim that *TCS* is based in part on the 2015 *Shuffle Tech* case that is "closely related" to these Plaintiffs' claims. Second Amended Complaint ¶ 1; ECF No. 5, *5. The defendants are all identical and the plaintiffs are "substantial[ly] similar[]." *Kohn*, 787 F.3d at 1240. Furthermore, as Plaintiffs and interveners have pointed out to this Court, the legal issues are substantially identical: the alleged fraudulent obtainment and enforcement of disputed patents. ECF No. 5, *6; Second Amended Complaint ¶ 51. Thus, if any of the cases proceed to merits discovery (which they should not), they can and should be heard in Illinois.

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

. . . . .

# IV.     CONCLUSION

Defendants respectfully request that Plaintiffs' Second Amended Complaint be dismissed with prejudice.  In the alternative, Defendants request that the Court compel arbitration on an individual basis for each Plaintiff.  Lastly, if the Court neither dismisses the case nor compels arbitration, then Defendants request that this Court transfer this case to the Northern District of Illinois.

Dated: November 19, 2020

CAMPBELL & WILLIAMS

By: /s/ **Philip R. Erwin**
PHILIP R. ERWIN, ESQ. (11563)
700 South Seventh Street
Las Vegas, Nevada 89101
Telephone: (702) 382-5222
Facsimile: (702) 382-0540

Craig C. Martin (*pro hac vice*)
Matt D. Basil (*pro hac vice*)
Sara Tonnies Horton (*pro hac vice*)
WILLKIE FARR & GALLAGHER LLP
300 North LaSalle
Chicago, IL  60654
Telephone: (312) 728-9000

23

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that service of the foregoing **Motion to Dismiss Plaintiffs'**
**Second Amended Complaint or, in the Alternative, Compel Arbitration or Transfer** was
served on the 19th day of November, 2020 via the Court's CM/ECF electronic filing system
addressed to all parties on the e-service list.

<u>  /s/ *Philip R. Erwin*                        </u>
An employee of Campbell & Williams

**INDEX OF EXHIBITS**

| Exhibit | Description | Pages |
|---|---|---|
| A | Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 (Scientific Games Corporation) | 001-056 |
| B | Dow Jones Article *VendingData Denies It Infringed On Shuffle Master Patent* dated May 7, 2002 | 057-058 |
| C | Bloomberg Law Article *Federal Circuit Court of Appeals Grants VendingData (TM)* dated December 26, 2005 | 059-061 |
| D | Law 360 Article *Card Shuffler Co. Deals $100M Monopoly Suit to Rival* dated April 28, 2015 | 062-064 |
| E | Law 360 Article *Scientific Games Says Standing Sinks $100M Antitrust Suit* dated June 29, 2015 | 065-066 |
| F | Law 360 Article *Plaintiffs Defend $100M Card Shuffler Antitrust Suit* dated July 20, 2015 | 067-069 |
| G | Bloomberg Law Article *Bally Faces Monopoly Suit on Casino Card Shufflers* dated October 13, 2015 | 070-071 |
| H | Master Agreement between Bally Gaming, Inc. and Tonkawa Tribe of Indians of Oklahoma dated November 20, 2013 | 072-084 |
| I | License and Lease Agreement between Bally Gaming, Inc. and Umpqua Indian Development Corp. dated March 20, 2015 | 085-092 |

25